1  JOSEPH W. COTCHETT (SBN 36324)
2  jcotchett@cpmlegal.com
   NANCI E. NISHIMURA (SBN 152621)
3  nnishimura@cpmlegal.com
   JAMES DALLAL (SBN 277826)
4  jdallal@cpmlegal.com
   **COTCHETT, PITRE & McCARTHY, LLP**
5  840 Malcolm Road
6  Burlingame, California 94010
   Telephone:   (650) 697-6000
7  Facsimile:   (650) 697-0577

8  KELLY W. WEIL (SBN 291398)
9  kweil@cpmlegal.com
   **COTCHETT, PITRE & McCARTHY, LLP**
10 2716 Ocean Park Boulevard, Suite 3088
   Santa Monica, CA 90405
11 Telephone: (310) 392-2008
   Facsimile: (310) 392-0111

   P. TERRY ANDERLINI (SBN 44783)
   tanderlini@amlawoffice.com
   **ANDERLINI & McSWEENEY LLP**
   66 Bovet Road, Suite 285
   San Mateo, California 94402
   Telephone:   (650) 242-4884
   Facsimile:   (650) 212-0001

13 *Attorneys for Plaintiff*

14

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFONIA

| | |
|---|---|
| **TOYLING MAA,** individually and as personal representative of the **ESTATE OF WILSON MAA**; and the **ESTATE OF WILSON MAA,**<br><br>        Plaintiff,<br><br>        v.<br><br>**CARNIVAL CORPORATION,** a Panama corporation; **CARNIVAL PLC,** an England and Wales Corporation; and **PRINCESS CRUISE LINES, LTD.,** a Bermuda Corporation**,**<br><br>        Defendants. | CASE NO:   2:20-CV-06341-DSF-SK<br><br>**FIRST AMENDED COMPLAINT for:**<br><br>1. **NEGLIGENCE – PERSONAL INJURIES**<br><br>2. **NEGLIGENCE – WRONGFUL DEATH UNDER THE DEATH ON THE HIGH SEAS ACT**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE CONTENTS**

**PAGE NO.**

I. **INTRODUCTION** ............................................................................ **1**

II. **THE PARTIES** ............................................................................... **6**

 A. PLAINTIFFS ............................................................................ 6

 B. DEFENDANTS ......................................................................... 7

 C. ALTER EGO, AGENCY & JOINT VENTURE ........................... 9

III. **JURISDICTION & VENUE** ...................................................... **15**

IV. **FACTUAL ALLEGATIONS** ...................................................... **16**

 A. THE CRUISE SHIP INDUSTRY TAKES IN MASSIVE PROFITS
  BY SELLING LUXURY TRAVEL TO AMERICANS ...................... 16

 B. DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS
  AND DEADLY BEFORE INVITING PLAINTIFFS TO BOARD THE
  *CORAL PRINCESS* .................................................................. 18

 C. DESPITE KNOWING THEIR CRUISE SHIPS WERE ARMED WITH
  A CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS INVITED
  PLAINTIFFS TO BOARD THE SHIP AND FAILED TO TAKE ANY
  SAFETY PRECAUTIONS OR WARN PASSENGERS ...................... 29

 D. DEFENDANTS MAKE THE LION'S SHARE OF THEIR PROFITS
  FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES .................... 30

 E. DEFENDANTS DID NOT WARN OR ADVISE PASSENGERS OF
  THE VIRUS BEING ON-BOARD THE *CORAL PRINCESS* UNTIL
  THREE WEEKS AFTER BOARDING .......................................... 32

 F. DEFENDANTS UNLOAD PASSENGERS TO DIE ONLAND ......................... 39

 G. CARNIVAL IS NOW UNDER CONGRESSIONAL INVESTIGATION
  FOR THEIR KNOWLEDGE OF INFECTIONS ............................... 45

V. **NOTICE** ...................................................................................... **47**

VI. **CLAIMS** ...................................................................................... **47**

FIRST CLAIM47
NEGLIGENCE – PERSONAL INJURIES47
(ON BEHALF OF MRS. MAA AGAINST EACH DEFENDANT) ......................... 47

SECOND CLAIM53
NEGLIGENCE – WRONGFUL DEATH53
UNDER THE DEATH ON THE HIGH SEAS ACT53
(ON BEHALF OF THE ESTATE OF WILSON MAA AGAINST EACH DEFENDANT) ........................... 53

VII. **PRAYER FOR RELIEF AND DEMAND FOR JURY** .............. **54**

PLAINTIFF TOYLING MAA ("MRS. MAA"), individually, as surviving spouse of WILSON MAA ("MR. MAA"), deceased, and as personal representative of the ESTATE OF WILSON MAA (collectively hereinafter "PLAINTIFFS"), bring this action for personal injuries and wrongful death against DEFENDANTS **PRINCESS CRUISE LINES, LTD.** ("PRINCESS"), **CARNIVAL CORPORATION** ("CARNIVAL CORP."), and **CARNIVAL PLC** ("CARNIVAL PLC"; together with CARNIVAL CORP., "CARNIVAL"; and collectively with PRINCESS and CARNIVAL CORP. hereinafter "DEFENDANTS").

## I.   **INTRODUCTION**

1.      When MR. and MRS. MAA boarded the *Coral Princess* cruise ship in San Antonio, Chile on March 5, 2020, neither of them had any knowledge, notice, and/or warning that they were boarding a cruise ship armed with a super virus known to be highly contagious, kill at-risk populations quickly, and have no cure—SARS-CoV-2, the novel coronavirus that causes COVID-19.

2.      While PRINCESS and CARNIVAL maintain their United States' headquarters in California and Florida, respectively, the officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, ignored the "state of emergency" declarations related to COVID-19 made by the Governors of both states as of March 4, 2020, and instead made the negligent, wrongful, unlawful, and/or reckless decision to continue cruise ship operations without implementing any safety protocols and/or preventative measures, despite knowledge of the catastrophic risk to human life that COVID-19 posed and despite knowledge of the specific and acute threat the cruise ship industry presented related to COVID-19.

3.      Due to that negligent, wrongful, unlawful, and/or reckless decision of the officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, MR. and MRS. MAA boarded the *Coral Princess* cruise ship in San Antonio, Chile on March 5, 2020.

4.     The officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, knew of the specific and acute threat the cruise ship industry presented related to COVID-19 as of March 4, 2020.

5.     There had been two prior and/or on-going outbreaks aboard DEFENDANTS' other cruise ships: the *Diamond Princess* and the *Grand Princess*.

6.     The *Diamond Princess,* had been under quarantine at Yokohama's port near Tokyo since February 3, and as of February 20, 2020, world news was reporting that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." And further, "**[a] total of 634 people from the *Diamond Princess* have tested positive for COVID-19**, the Japanese agency said. **More than half that number are identified as "asymptomatic pathogen carriers," meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[1] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the *Diamond Princess* and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period *for their traveling partners and close contacts***."[2]

7.     The *Grand Princess* boarded new passengers on February 21, 2020, and set off from San Francisco for Hawaii. A passenger who disembarked the *Grand Princess* on February 21, 2020, but who had traveled with approximately 62 passengers and 1,000 crew members for over a week before, had COVID-19 and had been experiencing severe respiratory symptoms for his last seven days of the cruise.[3] Despite being aware of the passengers symptoms, DEFENDANTS, and/or each of

---

[1] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed June 5, 2020).

[2] Id.

[3] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020. (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

them, boarded new passengers onto the *Grand Princess*, and on March 4, 2020, Dr. Grant Tarling—who is the Chief Medical Officer and hailed by both DEFENDANTS as a world-renowned medical expert in the virulent nature of infectious diseases— issued a statement to all passengers indicating knowledge of a Coronavirus outbreak aboard.

8.     Approximately two weeks before the *Coral Princess's* scheduled departure on March 5, 2020, DEFENDANTS notified passengers with South Korean passports that they would not be allowed on the cruise, due to coronavirus-related travel restrictions imposed by the South Korean government.

9.     As of March 2, 2020, Vice President Michael Pence had also called a meeting with the heads of the cruise ship industry to discuss the specific and acute threat the cruise ship industry presented related to COVID-19. [4] After that meeting, Vice President Pence reported:

> "**We made it very clear that we needed cruise lines to be safer; to establish and to embrace new protocols; screening onboard, screening off; new medical protocols; shipboard processes for evacuating people that may contract coronavirus or a serious illness**," **Pence said at a news briefing on Monday**.[5]

10.     Yet CARNIVAL acting through its alter ego PRINCESS, and/or each of them, negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of their passengers, invited and boarded MR. and MRS. MAA onto the deadly cruise ship armed with COVID-19 without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew. CARNIVAL acting through its alter ego PRINCESS,

---

[4] https://www.reuters.com/article/us-health-coronavirus-airlines-whitehous/white-house-set-to-meet-with-senior-airline-cruise-industry-officials-idUSKBN20P2FC (last accessed June 5, 2020).

[5] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

**FIRST AMENDED COMPLAINT; 2:20-CV-06341-DSF-SK**                          3

and/or each of them, also negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of its passengers, failed to disinfect, decontaminate, and/or sanitize the exposed surfaces of the cruise ship prior to boarding MR. and MRS. MAA and failed to administer any coronavirus tests to any prior passengers and/or crew, leaving all new passengers, including MR. and MRS. MAA, completely, unknowingly, and inescapably exposed to the deadly virus.

11.    The officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, also knew of the catastrophic risk COVID-19 posed to human life as of March 4, 2020.  As of that date, COVID-19 had killed over 3,000 people and there were over 98,000 cases reported worldwide."[6] The CDC had also reported in February 2020, "**[i]t found that the novel coronavirus is more contagious than the related viruses which cause SARS and MERS. While the resulting disease, Covid-19, is not as fatal on a case-by-case basis, its greater spread has already led to more deaths than its related coronaviruses**."[7] "**Because the Covid-19 virus has infected far more people than the viruses that caused SARS and MERS, the number of people who have died from it so far has already overtaken both viruses.**"[8]

12.    Despite the aforementioned knowledge, the officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, made the negligent, wrongful, unlawful, and/or reckless decision to continue cruise ship operations without implementing any safety protocols and/or preventative measures to combat the foreseeable, specific, and/or acute and catastrophic threat posed to their passengers, including but not limited to, (a) screening and refusing to board passengers and crewmembers with recent contact with countries experiencing

---

[6] https://www.worldometers.info/coronavirus/worldwide-graphs (last accessed June 5, 2020).
[7] https://www.cnn.com/2020/02/19/health/coronavirus-china-sars-mers-intl-hnk/index.html (last accessed June 5, 2020).
[8] Id.

outbreak of COVID-19; (b) providing precautionary medical apparatuses, such as masks, gloves and/or hand sanitizer; (c) imposing safety precautions on-board, such as social distancing; (d) disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship prior to boarding passengers; and/or (e) changing how they off-board and on-board passengers to the ship, instead of using practices where passengers off-boarding the ship come in close contact with passengers on-boarding the ship. As a legal result of the aforementioned wrongdoing, PLAINTIFFS both got COVID-19 on the *Coral Princess* and MR. MAA eventually died from the virus.

13.    According to industry experts, commercial cruise ship companies make money in two ways: tickets sales and on-board purchases. While tickets represent a majority of revenue for this companies, ***onboard purchases account for the lion's share of the profit***.[9] This dynamic creates an obvious financial incentive for the officers, directors, and/or managing agents of DEFENDANTS to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket.

14.    Further, Dr. Tarling, whose office is located in Santa Clarita, California, knows (and at all relevant times knew) about the virulent nature of infectious diseases. CARNIVAL touts his 27 years of experience overseeing the health and welfare of 12 million passengers annually and thousands of crew members aboard CARNIVAL'S 104 cruise ships across its nine cruise lines.  Dr. TARLING is an internationally recognized medical expert in the cruise industry for developing and implementing policies and procedures to protect global travelers:

> *Dr. Tarling is also charged with developing and implementing research-based public health policies and procedures that protect large populations of global travelers.  His expertise is routinely called upon by national and international health authorities to help develop prevention and control measures to mitigate the global spread of*

---

[9] Id.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1      *communicable diseases such as Zika, Ebola, MERS, Chikungunya,*

2      *Legionella, noroviruses and novel influenza viruses.[10]*



11

3

4

5

6

7

8

9

10

11

12  **II.**    **THE PARTIES**

13      **A.**    **PLAINTIFFS**

14      15.    PLAINTIFF **Toyling Maa** ("MRS. MAA") is and was at all times

15  relevant to this Complaint, a resident of the City of South San Francisco within the

16  County of San Mateo, California. MRS. MAA was a ticketed passenger who boarded

17  the *Coral Princess* cruise on March 5, 2020 in San Antonio, Chile after using a ticket

18  for air travel purchased from DEFENDANTS to fly to South America from San

19  Francisco. MRS. MAA is also the surviving spouse of MR. MAA, and is the court-

20  appointed personal representative of MR. MAA's Estate.[12] By virtue of the premises,

21  MRS. MAA is lawfully entitled to initiate this Complaint in her individual capacity,

22  as well on behalf of the ESTATE OF WILSON MAA in pursuit of a survival action.

23  [10] https://www.princess.com/news/notices_and_advisories/notices/dr-grant-tarling-

24  chief-medical-officer.html (last accessed June 5, 2020).

25  [11] https://www.theguardian.com/world/2020/apr/04/coral-princess-cruise-ship-
docks-florida-coronavirus-pandemic (last accessed June 5, 2020).

26  [12] Issuance of the court order appointing Mrs. MAA the personal representative is

27  pending. *See* 42 U.S.C. § 30302; *Helman v. Alcoa Global Fasteners, Inc.*, 843
F.Supp.2d 843 (C.D. Cal. 2011).  MRS. MAA is the sole beneficiary of MR.

28  MAA'S trust and successor-in-interest pursuant to Cal. Civ. Proc. Code § 377, et
seq.

16.     PLAINTIFF **Wilson Maa** ("MR. MAA"), now deceased, was at all times relevant to this Complaint a resident of the City of South San Francisco within the County of San Mateo, California. MR. MAA was a ticketed passenger who boarded the *Coral Princess* cruise on March 5, 2020 in San Antonio, Chile after using a ticket for air travel purchased from DEFENDANTS to fly to South America from San Francisco.

**B.     DEFENDANTS**

17.     DEFENDANT **Carnival Corporation** ("CARNIVAL CORP.") was incorporated in Panama in 1972. DEFENDANT **Carnival plc** ("CARNIVAL PLC") was incorporated in Wales, United Kingdom in 2000. As described by CARNIVAL in a filing with the Securities and Exchange Commission, "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival plcs's Articles of Association." Carnival Corporation and Carnival plc operate as a single economic enterprise, and share a senior executive management team and identical Boards of Directors. The dual-listed company has its headquarters in Miami, Florida. This lawsuit is being brought against both CARNIVAL CORP. and CARNIVAL PLC for actions and decisions attributable to both taken by and on behalf of the dual-listed company. Allegations herein against DEFENDANT "CARNIVAL" refer to the dual-listed company encompassing both CARNIVAL CORP. and CARNIVAL PLC.

18.     DEFENDANT **Princess Cruise Lines LTD** ("PRINCESS") is incorporated in Bermuda, with its headquarters in Santa Clarita, California. Santa Clarita serves as the nerve center for PRINCESS, and all major decisions regarding operation of its cruise ships are made at the headquarters in Santa Clarita, California.

/ / /

/ / /

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP



13

19.    CARNIVAL and PRINCESS are collectively referred to herein as "DEFENDANTS."

20.    Agent for DEFENDANTS, Dr. Grant Tarling, M.D., M.P.H. ("TARLING"), is and was at all times hereto employed by DEFENDANT CARNIVAL as the Group Senior Vice President and Chief Medical Officer for the CARNIVAL'S cruise lines including PRINCESS, Carnival Cruise Lines, Holland America Line, Seabourn, P&O Australia and HAP Alaska, totaling 104 ships.  He earned his medical degree from the University of Witwatersrand Medical School in Johannesburg, South Africa, and executive master's degree in healthcare administration and policy from UCLA. His offices are located at the headquarters for CARNIVAL and PRINCESS in Santa Clarita, California.  Dr. Grant TARLING is a resident of the County of Los Angeles.

21.    At all times hereto, PRINCESS and CARNIVAL advertised, marketed, sold, and profited (directly or indirectly) from, and controlled and operated the cruise ship *Coral Princess*.

---

[13] Princess Cruises headquarters in Santa Clarita, California. (last accessed June 5, 2020).

## C.      ALTER EGO, AGENCY & JOINT VENTURE

22.      DEFENDANTS CARNIVAL CORP. and CARNIVAL PLC are admittedly alter egos of each other and indistinguishable as the same entity and are therefore treated herein as DEFENDANT "CARNIVAL."

23.      DEFENDANTS PRINCESS and CARNIVAL are alter egos and/or agents of each other such that the corporate form should be disregarded.

24.      CARNIVAL has ownership and control over PRINCESS, which is organized under the dual-listed CARNIVAL presenting itself as Carnival Corporation & plc. CARNIVAL has claimed in filings with the Securities and Exchange Commission (SEC) that it wholly owns PRINCESS as a subsidiary.[14]

25.      CARNIVAL and PRINCESS share the same Board of Directors and almost all of the same executive officers, and appear to use the same assets.

26.      CARNIVAL serves as the parent company for PRINCESS, which it calls a "Carnival Brand" cruise line and which CARNIVAL refers to as "part of our growing business." CARNIVAL exerts control over PRINCESS's business and day-to-day operations.

27.      CARNIVAL exerts dominion and control over PRINCESS's business and day-to-day operations as the parent company of PRINCESS, which CARNIVAL refers to as a "Carnival Brand" cruise line and part of CARNIVAL's "portfolio of leading global, regional and national cruise brands."[15]

28.      According to its 2019 Annual Report, CARNIVAL is the owner of the *Coral Princess* and of all the cruise ships operated by the nine separately branded CARNIVAL cruises lines, including PRINCESS. CARNIVAL lists some $38 billion in "Property and Equipment, Net" on its consolidated balance sheets as assets of CARNIVAL, out of a grand total of $45 billion in assets.[16] Under Note 2, "Significant

---

[14] *See* Carnival Corporation Form 10-K ("Carnival 10-K") for the Fiscal Year Ended November 30, 2019, pp. 8, 10-11.
[15] Carnival Corporation & plc 2019 Annual Report, p. 1.
[16] Carnival Corporation & plc 2019 Annual Report, p. 7.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Accounting Policies," CARNIVAL lists "Ships" as the first category of assets within the section on "Property and Equipment," and again later in the report.[17] Ownership of these assets forms a significant part of the basis for CARNIVAL's valuation and inducement for public investors to invest in CARNIVAL stock. As the owner of the *Coral Princess,* CARNIVAL owes a direct, non-delegable duty of care to passengers aboard the ship.

29.    The CARNIVAL Board of Directors is empowered to make decisions governing the operation of PRINCESS, and PRINCESS makes use of CARNIVAL assets in conducting cruise operations.[18]   CARNIVAL has the right to choose the officers of PRINCESS. PRINCESS does not have its own independent board of directors. CARNIVAL could, if it chose, dissolve and wind up PRINCESS on its own initiative regardless of any contrary desire not to do so on the part of PRINCESS or any of the officers of PRINCESS.

30.    Among the shared officers of CARNIVAL and PRINCESS is Dr. Grant Tarling, who by his own admission serves as "Senior Vice President and Chief Medical Officer" for five cruise lines owned by CARNIVAL, including PRINCESS, Carnival Cruise Line, Carnival Australia, Seabourn, and Holland America.[19]   Dr. Tarling serves at the direction of and in coordination with CARNIVAL.

31.    The decision by CARNIVAL and PRINCESS that PRINCESS cruises proceed as scheduled in February and March, 2020, after DEFENDANTS knew or should have known that the Coronavirus was a global health threat, and the subsequent decision to suspend cruise operations, were made by executives of CARNIVAL and PRINCESS, including at the direction of and in consultation with CARNIVAL senior executives, President & Chief Executive Officer Arnold W. Donald, PRINCESS President Jan Swartz, and CARNIVAL and PRINCESS Senior Vice President and

---

[17] *Id.,* pp. 10-11, 17.
[18] *See id.,* p. 17 (listing "Ships" as CARNIVAL "Property and Equipment").
[19] Public LinkedIn profile of Dr. Grant Tarling, available at https://www.linkedin.com/in/grant-tarling/ (last accessed Sept. 12, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Chief Medical Officer Dr. Grant Tarling.[20]   CARNIVAL exercises dominion and control over PRINCESS, as it does over each of CARNIVAL's other cruise lines. CARNIVAL controls, operates, harmonizes, and coordinates the operations of PRINCESS and its other cruise lines to maximize benefits for CARNIVAL and its shareholders. CARNIVAL controls every aspect of operations for PRINCESS, including where to operate, what volume of cruises to offer or passengers to service in a given market, whether to invest in new routes, nor whether to continue or suspend services. PRINCESS does not operate without authorization from CARNIVAL.

32.    According to its 2019 Annual Report, CARNIVAL has a single integrated operating budget for all of its cruise operations including all nine of its cruise lines. There are no separate books for PRINCESS. There is not even a single separate line item reflecting the separate operations and performance of PRINCESS. Consolidated financials are reported not by cruise line, but through a geographic sectoral approach that differentiates between the North America and Australia ("NAA") segment and Europe and Asia ("EA") segment, and then adds figures for "Cruise Support" and "Tour and Other." These figures are not broken down to reveal the separate performance of PRINCESS or any of the other CARNIVAL lines. The cruise lines are not deemed relevant for shareholder analysis or from the perspective of operating the integrated CARNIVAL business.

33.    CARNIVAL's 2019 Annual Report discloses "Capital expenditures of $3.8 billion for our ongoing new shipbuilding program," without differentiating among the cruise lines who will be operating the cruise ships once built. The Annual Report also refers to a single "shipbuilding contract" and lists currency risk associated with the new PRINCESS-operated *Enchanted Princess* on the same table of figures

---

[20] A. Carr & C. Palmieri, "Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going," *Bloomberg BusinessWeek,* April 16, 2020, available at*: https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/* (last accessed Sept. 14, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

as the new Carnival Cruise Lines-operated *Mardi Gras.*[21] Sales of ships are reported without reference to cruise line affiliation; for sold ships CARNIVAL reports only the passenger capacity and whether the ship is in the NAA segment or EA segment.[22]

34.     To the extent assets are assigned to or held by PRINCESS if at all, such activity is controlled and dictated by CARNIVAL. PRINCESS does not have the right to retain its own profits. CARNIVAL may freely assign assets and funding among its subsidiaries including by assigning them to or removing them from control of PRINCESS. Transactions between CARNIVAL and PRINCESS and between and among PRINCESS and the other subsidiaries of CARNIVAL are not true arm's length agreements and are for the benefit of and at the direction of CARNIVAL, to the exclusion of advancing any independent interest of PRINCESS or any of the other CARNIVAL subsidiaries.

35.     Public investors cannot invest separately in PRINCESS, which has no publicly traded stock of its own. Rather, investors must invest in the dual-listed CARNIVAL, in either Carnival Corporation (CCL) or Carnival plc (CUK) on the New York Stock Exchange or in Carnival plc (CCLL) on the London Stock Exchange. There are no public shares of PRINCESS available to trade because PRINCESS is owned and controlled entirely by CARNIVAL and is a mere instrumentality of CARNIVAL.[23]

36.     Following the Federal Reserve's decision to increase the size of its lending program and thereby enable hedge funds to buy up corporate bonds at much lower interest rates, CARNIVAL has shored up its finances via a massive infusion of nearly $6 billion in cash. CARNIVAL is therefore well-capitalized despite the suspension of operations at all nine of its cruise lines.[24]

---

[21] *Id.* at 28; 59-60.
[22] *Id.* at 17.
[23] *See* Princess website, "For Investors" at *https://www.princess.com/aboutus/investors/index.jsp* (last accessed Sept. 12, 2020).
[24] M. Matousek, "The Fed may have saved Carnival from having to pay over 15% interest on its new bonds," *Business Insider,* Apr. 27, 2020, at

37. The same may not be true for PRINCESS, however. PRINCESS suspended operations as of March 12, 2020 and still cannot operate legally under current government orders, and therefore has not had access to its usual source of revenue.[25]

38. PRINCESS has been the hardest hit of the CARNIVAL cruise lines and perhaps of all cruise lines globally by the pandemic, as PRINCESS has this year faced coronavirus outbreaks aboard the *Diamond Princess, Ruby Princess,* and *Grand Princess* in addition to the *Coral Princess* cruises at issue here. While over 40 cruise ships have experienced coronavirus outbreaks during the pandemic, four have been PRINCESS cruise ships, and those four include the three causing the most deaths among all cruise ships globally. As of early September 2020, of 88 known fatalities resulting from cruise ship coronavirus outbreaks globally, 52 deaths have resulted from cruises operated by PRINCESS.[26] Therefore there is a heightened but plausible

---

*https://www.businessinsider.com/carnival-faced-higher-interest-rate-new-debt-before-fed-action-2020-4?op=1* (last accessed Sept. 12, 2020).

[25] C. Hansen, "Princess Cruises Suspends Service for Two Months Amid Coronavirus Pandemic," U.S. News. & World Report, Mar. 12, 2020, at *https://www.usnews.com/news/national-news/articles/2020-03-12/princess-cruises-suspends-service-for-two-months-amid-coronavirus-pandemic* (last accessed Sept. 12, 2020); Centers for Disease Control and Prevention, "Quarantine and Isolation: Cruise Ship Guidance," updated July 16, 2020, at *https://www.cdc.gov/quarantine/cruise/index.html* (last accessed Sept. 13, 2020) (extending government shutdown of cruise industry through September 30, 2020).

[26] *See https://www.miamiherald.com/news/business/tourism-cruises/ article241914096.html*; https://www.abc.net.au/news/2020-08-14/ruby-princess-coronavirus-inquiry-findings-handed-down/12557714; *"Placer County announces death of patient with COVID-19 | Placer County, CA". Placer.ca.gov.* March 4, 2020 (Retrieved May 6, 2020); *"Lawsuit over death of retired Dallas firefighter says cruise line failed to warn of outbreak". Dallas News.* April 15, 2020; *Evan Webeck* (April 3, 2020)*. "Coronavirus: Grand Princess crew member dies in SF hospital". Mercurynews.com.* Retrieved May 6, 2020; *Merlin, Michelle. "'It's been a nightmare': Family recalls Whitehall man's final days after contracting coronavirus on Grand Princess cruise". mcall.com*; "Man in his 70s, Grand Princess passenger, Marin County's first COVID-19 death | KTVU FOX 2". *Ktvu.com.* Retrieved May 6, 2020 (last accessed Sept. 25, 2020); *see generally* "COVID-19 pandemic on

risk that PRINCESS may be unable to cover all the claims against it to compensate for these injuries absent financial contribution from its alter ego corporate parent CARNIVAL.

39.     While the coronavirus was spreading globally, and cruise ship passengers were becoming ill and dying, including passengers of CARNIVAL and PRINCESS, certain CARNIVAL directors and officers sold significant volumes of their CCL stock in January and February 2020.  They sold their stock at a time when they were in a unique position to understand the significance and severity of the pandemic in a way that the broader public and public investors would not know. In particular, CARNIVAL President & CEO Arnold Donald sold 24,699 shares of CCL stock on February 14, 2020, at the operative share price of $42.9341, netted him a payday of $1,060,429.34. Such transactions taking money out of the company may impact the ability of CARNIVAL and of PRINCESS to pay meritorious claims.[27]

40.     As alleged herein, CARNIVAL exercises total domination over PRINCESS to the extent that PRINCESS manifests no separate corporate interests of its own.

41.     As alleged herein, treating CARNIVAL and PRINCESS as separate corporate entities works injustice upon PLAINTIFFS – innocent third parties.

42.     At all times herein mentioned, DEFENDANTS, and/or each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other DEFENDANTS named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each DEFENDANT has ratified and approved the acts of each of the remaining DEFENDANTS.  Each of the DEFENDANTS aided and abetted, encouraged, and

---

cruise ships," and sources cited, https://en.wikipedia.org/wiki/COVID-19_pandemic_on_cruise_ships (last accessed Sept. 12, 2020).
[27] Carnival Corp., Statement of Changes in Beneficial Ownership (Form 4), Table I (Feb. 19, 2020).

rendered substantial assistance to the other DEFENDANTS in breaching their obligations to PLAINTIFFS, as alleged herein.  In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the DEFENDANTS acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## III.   **JURISDICTION & VENUE**

43.    This court has jurisdiction over this matter pursuant to California Code of Civil Procedure § 395, because at all times relevant, DEFENDANTS, and each of them, resided in and/or did business in the State of California and the events which combined to produce the injuries sustained by PLAINTIFFS occurred in the County of Los Angeles, State of California. DEFENDANTS do substantial business in California. DEFENDANT CARNIVAL, by and through its subsidiary, PRINCESS, markets cruise vacations to California residents. Both maintain a headquarters in Santa Clarita, California, and employ thousands of California residents to work there, including Dr. TARLING who maintains an office at the Santa Clarita headquarters. PRINCESS directly markets and sells air travel to passengers located throughout California to convey said passengers to the boarding locations of DEFENDANTS' cruises. Moreover, the claims asserted herein arise from DEFENDANTS' contacts with California, including the sale of air travel to PLAINTIFFS who were at the time of purchase located within California. Each of these facts independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over DEFENDANTS, and/or each of them, permissible under traditional notions of fair play and substantial justice.

44.    Venue is proper in the County of Los Angeles because a substantial part of the events, acts, omissions and/or transactions complained of herein occurred in

and/or originated from Los Angeles County, State of California. The amount in controversy exceeds the jurisdiction minimum of this court.

45.    Additionally, each of the DEFENDANTS, purports to be a party to the Passage Contract, which purports to name Los Angeles County Superior Court as the proper venue for actions against DEFENDANTS where federal courts lack subject matter jurisdiction, including in cases involving death arising inside the United States where diversity of citizenship between parties does not exist. The Passage Contract also purports that California law shall apply to such cases. PLAINTIFFS, however, do not concede the enforceability of the Passage Contract. Nevertheless, by naming this Court as a proper venue, DEFENDANTS have consented to personal jurisdiction in this Court.

## IV.    FACTUAL ALLEGATIONS

### A.    THE CRUISE SHIP INDUSTRY TAKES IN MASSIVE PROFITS BY SELLING LUXURY TRAVEL TO AMERICANS

46.    Today's CARNIVAL grew out of Carnival Cruise Lines, a cruise line formed in 1972 by Israeli business magnate Ted Arison. Operations began with a single cruise ship, and rapidly expanded on the strength of Arison's vision of rebranding and marketing luxury cruises to a vacation option accessible to the general public. Arison gained full control of the company in 1974. By 1987, Carnival evolved into the industry leader and went public.

47.    Expansion continued thereafter, spurred on by major acquisitions. CARNIVAL acquired the Holland America Line in 1989, Seabourn in 1992, top European cruise line Costa Cruises in 1997, and the Cunard Line in 1998. Then in April 2003, CARNIVAL merged with P&O Princess Cruises plc, thereby bringing within the CARNIVAL corporate ambit the additional Princess, P&O Cruises, P&O Cruises Australia, AIDA Cruises, Ocean Village, and Swan Hellenic cruise lines.

48.     CARNIVAL operates "nine cruise lines with over 102 ships, carr[ies] 12 million passengers annually, and the corporation represents 50% of the global cruise market."[28]

49.     As CARNIVAL itself acknowledges, this extraordinary degree of consolidation is not readily apparent. As stated on its website, "Carnival's unprecedented rise to the world's largest cruise operator can be attributed to its ability to manage brand autonomy, with each major cruise line maintaining separate sales, marketing and reservation offices, as well as through the industry's most aggressive shipbuilding program."[29]

50.     Based on its 2019 Annual Report, CARNIVAL is the owner of the *Coral Princess* and of all the cruise ships operated by the nine separately branded CARNIVAL cruises lines, including PRINCESS. CARNIVAL lists some $38 billion in "Property and Equipment, Net" on its consolidated balance sheets as assets of CARNIVAL, out of a grand total of $45 billion in assets.[30] Under Note 2, "Significant Accounting Policies," CARNIVAL lists "Ships" as the first category of assets within the section on "Property and Equipment."[31] Ownership of these assets forms a significant part of the basis for CARNIVAL's valuation and inducement for public investors to invest in CARNIVAL stock. As the owner of the *Coral Princess,* CARNIVAL owes a direct, non-delegable duty of care to passengers aboard the ship.

51.     The scope of CARNIVAL's operations is massive. CARNIVAL bills itself as "the world's largest leisure travel company" and trumpets its status as "among the most profitable and financially strong in the cruise and vacation industries." In Fiscal Year 2019 CARNIVAL's operations reaped over $20.8 billion in revenue and generated nearly $3 billion in profit.[32]

---

[28] https://www.carnivalcorp.com/corporate-information/mission-and-history (last accessed June 5, 2020).
[29] *Id.*
[30] Carnival Corporation & plc 2019 Annual Report, p. 7.
[31] *Id.,* pp. 10-11.
[32] Carnival Corp. & plc 2019 Annual Report, p.1. (last accessed June 5, 2020).

52.     As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But three players — Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norweigan Cruise Line HLD — control[led] roughly 75% of the market."[33] "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018."

53.     "In 2011, three-quarters of the nearly 16 million cruise bookings worldwide were made from the United States, according to the industry group Cruise Lines International Association, which represents 26 cruise lines, including the world's largest, Carnival and Royal Caribbean."[34]

54.     And "[i]n 2018, 28.5m passengers — the bulk of them from America — spent more than $46B on cruises globally."[35]

## B.     DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE INVITING PLAINTIFFS TO BOARD THE *CORAL PRINCESS*

55.     The cruise industry has a well-documented problem with the spread of disease on board cruise ships, so much so that the United States Centers for Disease Control and Prevention (CDC) maintains a Vessel Sanitation Program to inspect cruise ships and report and track onboard viral outbreaks.

56.     Since 1994, PRINCESS cruise ships have hosted over 50 outbreaks of norovirus and other pathogens, and other CARNIVAL lines have experienced countless others.

/ / /

/ / /

---

[33] https://thehustle.co/the-economics-of-cruise-ships/ (last accessed June 5, 2020).
[34] https://www.cnn.com/2013/02/13/opinion/walker-cruise-ships/index.html (last accessed June 5, 2020).
[35] https://thehustle.co/the-economics-of-cruise-ships/ (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

36

57.    To assuage potential passengers' concerns about viruses on board, CARNIVAL'S website also touts its Health, Environmental, Safety, Security, and Sustainability Policy, highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss." [37]

/ / /

/ / /

---

[36] https://www.cruisecritic.com/photos/ships/coral-princess-278/balloon-drop-party-399174/balloon-drop-party--v17735161/ (last accessed June 5, 2020).

[37] https://www.carnivalplc.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1
2
3
4
5
6
7
8
9
10
11
12



38

13    58.    CARNIVAL confirms this commitment on its website, offering the

14  following assurance on a page bearing the caption, "Carnival's Commitment to

15  Guest and Crew Health":

16        *Carnival Cruise Line's highest responsibilities include the*

17        *health and safety of our guests and crew. Coronavirus is a*

18        *fluid situation and we continue to work closely with public*

19        *health experts and the Cruise Lines International Association*

20        *(CLIA), to monitor, screen and implement best practices to*

21        *protect the health of our guests and crew as it relates to*

22        *COVID-19 (coronavirus). Our monitoring, screening and*

23        *operational protocols are designed to be flexible so that we*

24        *can effectively adapt to changes as they occur.*[39]

25    59.    CARNIVAL employs Dr. TARLING both directly and through

26  PRINCESS, and he is touted by both as an expert on policies and procedures to prevent

27

28

[38] https://www.cruisecritic.com/photos/ships/coral-princess-278/universe-lounge-396741/universe-lounge--v17734502/ (last accessed June 5, 2020).
[39] https://www.carnival.com/health-and-sailing-updates (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

the spread of communicable diseases on CARNIVAL'S more than 100 cruise ships. TARLING is responsible for public health concerns for CARNIVAL and PRINCESS as Group Senior Vice President and Chief Medical Officer, to serve in that capacity for both companies.  He is a medical doctor and according to the website, "earned an Executive Master of Public Health degree in Health Care Management and Policy, and Global Health certification from [UCLA]." In addition, in "2016, he was elected for a second, four-year term as Chair and Chair-Elect of the Cruise Ship Medicine Section of the American College of Emergency Physicians.  In that role, he vigorously championed best-practice healthcare guidelines that have been adopted by the Cruise Line International Association (CLIA) whose members represent 95% of the world's cruise lines."  According to Dr. TARLING, a ship's medical facility is not a mere first-aid clinic.  "Each ship's modern medical center has a physical infrastructure that allows provision of a broad range of both ambulatory care services and inpatient hospital services, including an ICU.  It has a self-contained pharmacy, lab and imaging, which is staffed by a small physician-led clinical team."  He oversees about 800 clinical staff working at sea who are supported by about 50 staff in the U.S. between Los Angeles, Miami, and Seattle.[40]

60.    The Coronavirus now known as SARS-CoV-2 first appeared in Wuhan, Hubei Province within the People's Republic of China in December 2019.

61.    National Geographic reported on February 18, 2020, that "[f]or most patients, COVID-19 begins and ends in their lungs, because like the flu, coronaviruses are respiratory diseases."[41] And labeled respiratory failure as "the defining signature of severe cases".

62.    CNN reported on February 19, 2020, regarding the results of the most extensive and comprehensive study of the Coronavirus performed by China's CDC

---

[40] https://americanhealthcareleader.com/2018/how-grant-tarling-navigates-healthcare-for-8-million-travelers/ (last accessed June 5, 2020).

[41] https://www.nationalgeographic.com/science/2020/02/here-is-what-coronavirus-does-to-the-body/#close (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

and published in *The Chinese Journal of Epidemiology* two days prior. "**It found that the novel coronavirus is more contagious than the related viruses which cause SARS and MERS. While the resulting disease, Covid-19, is not as fatal on a case-by-case basis, its greater spread has already led to more deaths than its related coronaviruses**."[42] "**Because the Covid-19 virus has infected far more people than the viruses that caused SARS and MERS, the number of people who have died from it so far has already overtaken both viruses.**"[43]

63.    On February 20, 2020, NPR reported "[m]ore than 75,000 COVID-19 cases have been confirmed worldwide, according to a disease-tracking dashboard created by the Johns Hopkins Whiting School of Engineering. The virus has killed more than 2,000 people … ."[44]  The same article reported that "[t]he number of confirmed COVID-19 cases in South Korea has doubled in just 24 hours, to 104 from 51" according to the Korea Centers for Disease Control and Prevention.

64.    Any lingering doubt about the direct and specific danger the coronavirus posed to cruise ships went away with the highly publicized outbreak aboard the *Diamond Princess*, another of DEFENDANTS' cruise ships, several weeks earlier. The *Diamond Princess* had been under quarantine at Yokohama's port near Tokyo since February 3, and as of February 20, 2020, the global press was reporting that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." And further, "[**a] total of 634 people from the *Diamond Princess* have tested positive for COVID-19**, the Japanese agency said. **More than half that number are identified as "asymptomatic pathogen carriers," meaning that while they don't**

---

[42] https://www.cnn.com/2020/02/19/health/coronavirus-china-sars-mers-intl-hnk/index.html (last accessed June 5, 2020).
[43] Id.
[44] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  **show signs of the illness, they can still transmit the disease to others or become**
2  **sick themselves**."[45] An NPR article reporting on the tragedy also stated: "When
3  passengers test positive for the novel coronavirus, they're taken off the *Diamond*
4  *Princess* and sent to local hospitals. **Those diagnoses also reset the 14-day**
5  **quarantine period *for their traveling partners and close contacts***."[46]

6      65.   Accordingly, the United States CDC issued the following Media
7  Statement regarding the *Diamond Princess* outbreak on February 18, 2020:

8          *CDC believes the rate of new reports of positives new on*
9          *board, especially among those without symptoms, highlights*
10         *the high burden of infection on the ship and the potential for*
11         *ongoing risk.*

12     66.   Nevertheless, DEFENDANTS, and/or each of them, disregarded this
13 crucial information when knowingly faced with another likely COVID-19 positive
14 passenger on a different cruise ship—the *Grand Princess*—an outbreak
15 DEFENDANTS first acknowledged publicly on March 4, 2020, though they had been
16 aware of it sometime earlier.

17     67.   Prior to February 21, 2020, the *Grand Princess* had been on a roundtrip
18 cruise from San Francisco to Mexico. The Mexico cruise departed from San Francisco
19 on February 11, 2020, and was scheduled to return to San Francisco on February 21,
20 2020, when the *Grand Princess* was scheduled to off-load some passengers and on-
21 board some new passengers, then set sail to Hawaii.

22 / / /
23 / / /
24

---

25 [45] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-
26 princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed
27 June 5, 2020).
   [46] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-
28 princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed
   June 5, 2020).



47

68.     On February 20, 2020, the infected passenger aboard the *Grand Princess* visited that cruise ship's medical center to seek treatment for symptoms including "acute respiratory distress." Medical personnel aboard the ship, as well as responsible executives at CARNIVAL and PRNCESS including Dr. TARLING, knew or should have known that the symptoms were consistent with those suffered by passengers infected with SARS-Cov-2 aboard the *Diamond Princess* and others infected by the Coronavirus around the world, as reported widely in medical circles and the popular press.

69.     Dr. TARLING in fact later admitted that a passenger aboard the earlier *Grand Princess* Mexico cruise fell ill within "two or three days" of boarding the ship, and that the timing of when the passenger's symptoms first appeared indicates he

---

[47] *Grand Princess*-The Atrium-https://www.cruisecritic.com/photos/ships/grand-princess-54/member-8/36093/ (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

brought the Coronavirus onboard when he boarded the ship on February 11, 2020. [48]
Dr. TARLING added that while onboard, the passenger had a "six-to-seven day history of symptoms of acute respiratory illness." [49]

70.     Despite this information, DEFENDANTS, and/or each of them, off-boarded the sick passenger and boarded new passengers onto the *Grand Princess* ship in San Francisco on February 21, 2020, without providing any notice or warning to passengers and without instituting any safety precautions. Notably, approximately 62 passengers and 1,000 crew members from the Mexico leg of the trip who had traveled with the sick passenger for over a week did not disembark in San Francisco and continued on the trip to Hawaii.

71.     As of the week the *Coral Princess* set sail, U.S. officials had announced 21 confirmed COVID-19 cases aboard the *Grand Princess* which was currently moored off the coast of California.[50]



San Francisco police escort the coronavirus-stricken Grand Princess on its way to dock at the Port of Oakland on March 9.

Jane Tyska | Bay Area News Group | TNS

[48] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020. (last accessed June 5, 2020).
[49] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020. (last accessed June 5, 2020).
[50] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

72.     As a result, "The U.S. Coast Guard is now investigating whether Carnival violated a federal law that requires ships approaching U.S. ports to report outbreaks of illness to the Coast Guard and, in certain cases, to the CDC.  The rules are specific, defining a fever as a temperature of 100.4 degrees Fahrenheit or higher, as well as anyone who reports feeling feverish."[51]   That CARNIVAL passenger died in Placer County, California on March 4, 2020.


[52]

73.     Once equipped both with their previously existing awareness of their cruise ships' susceptibility to virus outbreaks and with the specific knowledge that two of its cruise ships, the *Diamond Princess* and *Grand Princess,* had succumbed to onboard outbreaks of SARS-CoV-2, DEFENDANTS chose not to suspend or change operations, but rather made the inexplicable decision to press forward in the same manner, just "doing business as normal" and place their passengers at further risk of infection, with no further precautions and for the sake of profit.

74.     Even as DEFENDANTS through Dr. TARLING confirmed the *Grand Princess* outbreak, operations continued unabated throughout the rest of the fleet, and on March 5, 2020 without so much as a warning to passengers DEFENDANTS boarded the *Coral Princess* at San Antonio, Chile and proceeded on a two-week South American cruise.

---

[51] *Id.*
[52] https://news.sky.com/story/coronavirus-21-people-stranded-on-grand-princess-cruise-ship-test postive-for-covid-19-11951315. (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

53

75.     Notably, less than a week later on March 12, 2020, DEFENDANTS made the decision to suspend all cruises due to COVID-19:

Shares of Carnival Corp. plunged by more than 31% Thursday after its **Princess Cruises line announced it was immediately suspending all operations for two months due to concerns over the rapidly spreading COVID-19 pandemic**.

The announcement impacts the cruise line's fleet of 18 ships, the company said, and will affect voyages from Thursday to May 10. **Princess Cruises President Jan Swartz said the company is taking the "bold action" to reassure investors of its commitment to the well-being of its passengers.**

…

Current Princess voyages that are underway and scheduled to end before March 17 will carry on as planned, the company said. **Voyages that extend beyond March 17 will be ended at the "most convenient location for guests," the company added**.

…

---

[53] https://www.mercury.news.com/2020/03/09/photos-coronavirus-stricken-grand-princess-arrives-at-port-of-oakland/. (last accessed June 5, 2020).

**"We've been asked, and we've asked ourselves, why COVID-19 seems to be impacting Princess so heavily,"** Swartz said in a video shared on YouTube. "We don't really know."

The State Department earlier this week issued an official advisory for Americans, especially those most vulnerable to COVID-19, which includes those with underlying health conditions, to "not travel by cruise ship." [54]

76.     In addition, it was widely reported that earlier in the week (i.e. within days of the *Coral Princess* boarding passengers and disembarking), DEFENDANTS, and/or each of them, had attended a meeting at the White House with the Vice President to discuss the needs for safety reform in the cruise ship industry due to the health risks exposed by COVID-19:

**Representatives of the cruise ship industry have met with White House officials, including Vice President Mike Pence, to discuss a coordinated response to COVID-19, Carnival Corp. spokesman Roger Frizzell said *earlier this week*.**

**"We made it very clear that we needed cruise lines to be safer; to establish and to embrace new protocols; screening onboard, screening off; new medical protocols; shipboard processes for evacuating people that may contract coronavirus or a serious illness,"** **Pence said at a news briefing on Monday.** "We're going to work with the cruise line industry to improve the safety, improve the health environment on cruise lines, in the short term and in the long term."

California Gov. Gavin Newsom said earlier this week that he is weighing cruise restrictions along the California coast as he awaits new federal guidelines for the industry. **He said cruise operators should, in the mean time, introduce aggressive requirements for travelers "at the peril of that industry collapsing**."[55]

---

[54] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

[55] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

77.     To make matters worse, DEFENDANTS, and/or each of them, were made aware of this anticipated meeting with White House officials at the latest on March 2, 2020, i.e. three days before *Coral Princess* boarded passengers and disembarked, indicating notice and/or knowledge by DEFENDANTS, and/or each of them, of the severity of the health risk to passengers on cruise ships as of that date at the latest. As reported by Reuters on March 2, 2020:

> The White House will hold meetings this week with top executives from U.S. airlines and the cruise industry amid the growing coronavirus outbreak, a spokeswoman for Vice President Mike Pence confirmed on Monday.
>
> …
>
> Pence's office said he will meet on Saturday with cruise line chief executives in Florida.[56]

## C.     DESPITE KNOWING THEIR CRUISE SHIPS WERE ARMED WITH A CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS INVITED PLAINTIFFS TO BOARD THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS

78.     DEFENDANTS, and/or each of them, failed to take any safety precautions prior to and/or at the time of boarding passengers on the March 5, 2020 *Coral Princess* cruise.

79.     DEFENDANTS did not take measures to disinfect, sanitize, and/or decontaminate the *Coral Princess* ship and/or exposed surfaces prior to boarding passengers, including PLAINTIFFS, as they boarded in San Antonio, Chile.

80.     DEFENDANTS, and/or each of them, failed to warn, advise, and/or provide notice to the *Coral Princess* passengers prior to and/or at the time of their boarding flights to the cruise departure point, including the flight PLAINTIFFS boarded in San Francisco on February 28, 2020, or prior to or at the time of boarding

---

[56] https://www.reuters.com/article/us-health-coronavirus-airlines-whitehous/white-house-set-to-meet-with-senior-airline-cruise-industry-officials-idUSKBN20P2FC (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

the *Coral Princess* itself, of the systemwide risk posed to the DEFENDANTS' cruise ships by the rapidly spreading Coronavirus.

81.   DEFENDANTS, and/or each of them, failed to subject any of the over 1,500 passengers or 878 crew members to any additional or enhanced medical or health screening procedures, including a COVID-19 test prior to sending them on a cruise where they would interact with one another in close quarters for over two weeks. DEFENDANTS, and/or each of them, conducted no additional inquiries or screening to identify and quarantine passengers who intended to board the *Coral Princess* after traveling from countries experiencing outbreak of the virus.

82.   DEFENDANTS, and/or each of them, failed to provide passengers, including PLAINTIFFS, with masks at the time of boarding and/or failed to implement any safety procedures for socializing on the cruise ship during travel, including social distancing and/or staying six feet apart from other unknown travelers.

83.   In addition, DEFENDANTS, and/or each of them, failed to make any adjustments and/or changes to how they off-board and on-board passengers to the cruise ship, and instead relied on practices where passengers off-boarding the ship come in close contact with passengers on-boarding the ship.

84.   DEFENDANTS, and/or each of them, proceeded as if everything was normal and nothing had changed, and the *Coral Princess* departed as scheduled on March 5, 2020.

### D.   DEFENDANTS MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES

85.   As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players — Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norwegian Cruise Line HLD — control[led] roughly 75% of the market."[57]

---

[57] https://thehustle.co/the-economics-of-cruise-ships/ (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

86.   "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018. Cruise ships make this money through two channels: Ticket sales and onboard purchases (e.g., alcoholic drinks, casino gambling, spa treatments, art auctions, and shore excursions), which passengers pay for with pre-loaded cruise cards and chip-equipped wristbands."[58]

87.   "On average, tickets account for 62% of total revenue and onboard purchases make up the remaining 38%. **Though tickets represent a majority of revenue, *onboard purchases account for the lion's share of the profit*, according to several experts**."[59]

> **As a high fixed-cost business, a cruise ship relies on getting as many passengers as possible *on the ship*** — even at fire-sale rates. **The major cruise lines will often fill each ship to 105%-110% capacity, then upsell its captive consumers on additional services.**
>
> **"They have mastered the ability to get their hands into people's pockets and to take out every last dollar,"** says Ross A. Klein, a professor at Memorial University of Newfoundland, who has closely studied the cruise ship industry. "They can almost give a cabin away for free and still make a profit."
>
> …
>
> On average, a passenger will spend $1,060 ($151/day) on a ticket and $650 ($92/day) on onboard purchases. After subtracting overhead costs, a ship will make out with roughly $291 in net profit per passenger, per cruise.
>
> **That means that at full capacity, a single ship like Royal Caribbean's Symphony of the Seas might make $9.8m in revenue ($1.7m of which is profit) during one 7-day excursion. *That's $239k in profit per day at sea*.**[60]

88.   This creates an obvious financial incentive for DEFENDANTS, and/or each of them, to knowingly board passengers on a cruise ship in the middle of a global

---

[58] Id.
[59] Id.
[60] Id.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

pandemic that created a substantial likelihood that each such cruise ship was armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket. And that is what happened here.

### E.    DEFENDANTS DID NOT WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE *CORAL PRINCESS* UNTIL THREE WEEKS AFTER BOARDING

89.    Despite all the signs of danger, PRINCESS in consultation with and with the full authorization of CARNIVAL embarked the South American cruise of the *Coral Princess* on March 5, 2020, as scheduled.

90.    The next day, March 6, 2020, CARNIVAL announced it would modify its typically onerous cancellation policies and offer credit for onboard purchasers who chose to continue with scheduled cruise travel through May 31, a move designed not to protect passengers but rather to entice passengers to continue with their travel plans despite the pandemic and thereby satisfy DEFENDANTS' primary objective, preserving their revenue stream.

91.    One week after the *Coral Princess* set sail from Chile, on March 12, 2020, DEFENDANTS finally acknowledged the pervasive nature of their Coronavirus problem and suspended operations.

92.    And despite the announcement of the "pause," PRINCESS in consultation with and with the full authorization of CARNIVAL continued operating the *Coral Princess* cruise which was then underway. All that happened aboard that ill-fated cruise resulted directly from the decision taken by CARNIVAL, PRINCESS, and Dr. TARLING to embark on March 5 in the midst of a global pandemic. That initial decision severely limited options for passengers and crew alike and led directly to the injuries suffered by PLAINTIFFS and others aboard the *Coral Princess*.

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12



Wilson Maa and wife Toyling Maa pose in March during a two-week cruise around South America. Wilson Maa, 71, of South San Francisco, contracted the coronavirus and died Saturday, April 4 in an ER room in a Florida hospital. The family had to work to get Toyling Maa off the ship and into a hospital after she showed symptoms of possible infection. (Courtesy of the Maa family)

13      93.     It appears that the first notification passengers received from
14  DEFENDANTS that anything had changed did not come until March 14, 2020, nine
15  days after departure. After that time, the *Coral Princess* no longer permitted
16  passengers to go ashore at their scheduled ports of call. PRINCESS in consultation
17  with and with the full authorization of CARNIVAL advised that the ship would
18  complete passage to the scheduled destination of Buenos Aires, Argentina, where it
19  was expected that those disembarking could more easily connect with their planned
20  onward travel. CARNIVAL, PRINCESS, and Dr. TARLING did not at this time call
21  for any other heightened protective measures. Apart from the changed itinerary, life
22  aboard the *Coral Princess* continued as usual.

23      94.     On March 17, 2020, all passengers aboard the *Coral Princess* were given
24  a temperature test. No other protective measures were imposed.

25      95.     On that same day, statewide and local government orders took effect in
26  California and touched off a wave of stay-at-home orders eventually affecting
27  virtually the entire United States.

28

96.     On March 19, 2020, the last day of the scheduled cruise, the *Coral Princess* landed at Buenos Aires, and some 500 passengers, citizens of Argentina and Switzerland, were permitted to disembark. Chaos reigned, as PRINCESS, in consultation with CARNIVAL, and its agents issued seriatim, often conflicting statements about flight itineraries and the ability of various groups and of individual passengers to disembark the cruise ship. MR. MAA and MRS. MAA had purchased their flights directly from PRINCESS, but PRINCESS nonetheless did not have reliable, up-to-date information about flight availability. MR. MAA and MRS. MAA were led to believe they would be able to disembark at Buenos Aires and fly home to California as scheduled by making use of the air travel they had purchased directly from PRINCESS. Other passengers were permitted to disembark and departed from the cruise ship to the airport, only to be advised that their flights were cancelled and directed to return to the cruise ship because they did not have authorization to remain within Argentina.

97.     According to earlier statements from PRINCESS at the direction of CARNIVAL, and/or each of them, the voyage was supposed to have ended and passengers were supposed to be able to choose where they disembark. PRINCESS in consultation with and with the full authorization of CARNIVAL stated on March 12: "Current Princess voyages that are underway and scheduled to end before March 17 will carry on as planned, the company said. **Voyages that extend beyond March 17 will be ended at the "most convenient location for guests," the company added**."[61] That is clearly not what happened. It does not even seem that DEFENDANTS made any attempt between March 12th and March 17th to end the voyage for passengers, regardless of whether the location was convenient or not. And for MR. and MRS. MAA any location would have been more convenient than being on that cruise ship. In fact, on March 17, MRS. MAA went to the front desk onboard to confirm that

---

[61] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

DEFENDANTS had made reservations for their new return flights home, the front desk attendant acknowledged the problem rescheduling flights and advised her they were emailing the head office in Santa Clarita, California.  On the evening of March 18, a note was left at the MAA's door advising that their flight home was cancelled, but that PRINCESS agents were still trying to email the Santa Clarita head office for help on new return flights because there was no way to call the office.

98.    On March 19, 2020, it took a passenger onboard to place a direct telephone call to PRINCESS'S office in Santa Clarita, to demand answers on their return flights.  PRINCESS personnel who answered the phone claimed to be unaware of any cancelled flights on American Airlines, and unaware of any emails from the *Coral Princess*. Later on March 19, 2020, passengers aboard the *Coral Princess* were informed that because the Argentine government had issued an order taking effect at midnight that would require any cruise ships to remain in port indefinitely, the *Coral Princess* would be departing immediately for its nominal home port in Fort Lauderdale, Florida. All 1,020 passengers, including some who had been returned to the ship following flight cancellations, departed Buenos Aires along with the 878 crew members.

99.    Only on March 19, 2020, the date when the cruise had originally been scheduled to conclude, did PRINCESS begin issuing status update reports for the *Coral Princess* as it had previously for the *Diamond Princess* and *Grand Princess.* Over the coming days these reports would track unsuccessful efforts to arrange for *Coral Princess* passengers to disembark as the ship made its way to Montevideo, Uruguay on March 21, toward a failed attempt to land at Rio de Janeiro, Brazil on March 24, and Bridgetown, Barbados on March 31, on its way to Fort Lauderdale.

100.   The communications by PRINCESS regarding the fate of the *Coral Princess* were meant to advise passengers and the public regarding its location, but were also carefully calibrated pretext designed to limit the scope of DEFENDANTS' ultimate liability. During the first 19 days of what had originally been scheduled as a

14-day cruise, PRINCESS in consultation with and with the full authorization of CARNIVAL in official updates regarding the *Coral Princess* did not once mention the words "virus," "pandemic," or "COVID-19."

101.   On March 24, 2020, however—five full days after its first public statement—PRINCESS issued a new update announcing that Brazil had denied *Coral Princess* passengers' authorization to disembark, and finally mentioned the global pandemic expressly. "There remains no known risk of COVID-19 onboard," the PRINCESS update stated. The update did not cite any source or disclose any facts in support of this self-serving pronouncement.

102.   On March 30, 2020, now eleven days after the scheduled conclusion of the cruise and 25 days after it began, a new PRINCESS update announced that the *Coral Princess* would be arriving in Barbados the following day to take on supplies, though no passengers would be permitted to go ashore. Once again, DEFENDANTS' official statement confirmed "There remains no known risk of COVID-19 onboard." DEFENDANTS knew or had reason to know this statement was materially misleading and intentionally omitted all reference to a very real known risk. By the time PRINCESS issued the March 30 update, several passengers had begun reporting feeling ill, and had begun testing passengers for the Coronavirus. Because the *Coral Princess* did not have means on the cruise ship to determine test results, DEFENDANTS as of that time had no legitimate basis for stating that no known risk existed.

103.   Undeniable facts finally eclipsed DEFENDANTS' misrepresentations the following day, March 31, 2020, when a subsequent PRINCESS update reported "The medical center onboard *Coral Princess* has reported a higher-than-normal number of people presenting influenza-like symptoms." The carefully crafted message omitted the most salient fact, that DEFENDANTS as of that time had no capability to assess the presence of Coronavirus and were therefore flying blind. The statement then noted that many passengers "have tested positive for regular influenza, however given

the concern surrounding COVID-19 (coronavirus), and out of an abundance of caution, guests have been asked to self-isolate in their staterooms and all meals will now be delivered by room service. Crew will remain in their staterooms when not working." This public statement was the first notification PLAINTIFFS and the other *Coral Princess* passengers had received about a viral outbreak on board the cruise ship, and until that time CARNIVAL, PRINCESS, and Dr. TARLING had still declined to impose any heightened protective measures. Up until that announcement, the passengers had still enjoyed free run of the ship.

104. Meanwhile, unbeknownst, and undisclosed to the passengers, the medical staff aboard the *Coral Princess* had transmitted test samples for 13 patients exhibiting potential COVID-19 symptoms to onshore authorities in Barbados.

105. By April 1, 2020, MR. & MRS. MAA had been captive onboard for almost two weeks since their 14-day cruise was scheduled to end on March 19.  MR. & MRS. MAA and all passengers aboard the *Coral Princess* had been kept completely in the dark by DEFENDANTS about the circumstances of their quarantine or when they would be returning home. After March 19, for most of that time onboard the *Coral Princess*, restaurants remained open, activities continued as usual, and passengers were allowed to congregate and socialize in crowds without any restrictions or safeguards.  There was no mention of the Coronavirus.  But by April 1, a dream vacation had become a nightmare for MR. & MRS. MAA, as they were both sick.  As detailed below, on April 1, 2020, MR. MAA tested positive for COVID-19.

106. On April 2, 2020, PRINCESS in another self-serving update announced publicly that it had sent these test samples "in response to a reported small cluster of cases of respiratory illness and in an abundance of caution." Whether "abundant" or not, the caution applied by DEFENDANTS had come too late, as fully 12 of the 13 individuals identified as symptomatic—7 passengers and 5 crew—had in fact tested positive for COVID-19.

107.   By April 3, 2020, two passengers had died on board from complications due to COVID-19. These deaths were not disclosed in DEFENDANTS' official updates.

108.   Meanwhile, Coast Guard officials denied permission for the *Coral Princess* to land at Fort Lauderdale due to "an unacceptable risk of medical emergency due to the inherent and high probability of transmission of COVID-19 aboard."



**Coral Princess cruise ship.** Joe Raedle/Getty Images)

109.   Passengers were finally allowed to land on April 4, 2020, at PortMiami in Miami, Florida. Another chaotic situation developed. Several passengers requiring immediate medical attention were transported to local hospitals via ambulance. Full disembarkation did not begin until two days later, April 6, 2020.

/ / /

/ / /

**Coral Princess cruise ship.** Joe Raedle/Getty Images)

### F.   DEFENDANTS UNLOAD PASSENGERS TO DIE ONLAND

110.   MRS. MAA and her husband had long planned for their South American cruise and had saved up for it for several years. They booked their tickets over a year in advance, in December 2018, and shortly thereafter added a pre-cruise tour to Machu Picchu in Peru, also booked through PRINCESS. Visiting Machu Picchu had been one of MR. MAA's "bucket-list" travel destinations. MR. MAA and MRS. MAA traveled to South America with three other couples who were lifelong family friends.

111.   MRS. MAA originally booked travel aboard the *Coral Princess* cruise for her and her husband online though Costco Travel on December 31, 2018. MRS. MAA then cancelled the cruise-only reservation and rebooked her and her husband on the 20-day Land Tour and Cruise including travel within Peru and Chile, again through Costco Travel, on January 3, 2019. MRS. MAA asked for and obtained a price adjustment on February 14, 2019. MRS. MAA finally added an air travel booking, once more through Costco Travel, using the Princess EZAir offered by PRINCESS, to secure a connecting flight from San Francisco to the tour departure point at Lima, Peru. Fees charged by DEFENDANTS to MRS. MAA and MR. MAA included

$12,048 for the cruise and touring package, $1,880 in airfare, and $700 in taxes and fees, for a total of $14,628.

112. Per the PRINCESS Booking Confirmation, from the time of booking PLAINTIFFS were immediately subject to an aggressive regime of cancellation penalties under which they would forfeit 20% of the purchase price starting 89 days before the departure date, or December 7, 2019; 50% of the purchase price starting 56 days before the departure date, or January 9, 2020; 75% as of February 6, 2020, four weeks before departure; and 100% as of February 20, 2020, two weeks from departure. Reports of virus outbreaks aboard DEFENDANTS' cruise ships including the *Diamond Princess* and *Grand Princess* intensified throughout this period, even as their severity was downplayed by DEFENDANTS, such that any passenger seeking to cancel would be subject to greater and greater penalties as the situation worsened. DEFENDANTS finally announced that it would provide some relief from this regime of onerous penalties, but only on March 6, 2020—the day after the *Coral Princess* departed from San Antonio, Chile.

113. On March 29, 2020, ten days after the scheduled conclusion of the *Coral Princess* South American cruise, as the cruise ship remained at sea en route from Buenos Aires to Fort Lauderdale, MR. MAA began feeling unwell, but seemed to improve after skipping dinner to take bed rest. The following day, March 30, 2020, he felt unwell again, developed a fever, and again slept in his cabin instead of eating dinner.

114. On March 31, 2020, PRINCESS issued its official *Coral Princess* update announcing an influenza outbreak on board. Communications issued aboard the ship advised passengers exhibiting symptoms to call an extension to report to the medical center. On that basis MRS. MAA called the extension. A doctor soon arrived at PLAINTIFFS' cabin, took nose and throat swabs for MR. MAA, which the doctor advised MRS. MAA was to test for the flu, and then advised that MR. MAA should report to the medical center to give X-rays because he heard something in his lungs.

The doctor left MR. MAA with flu medications, Tamiflu, Tylenol, pills for diarrhea and antibiotics. The doctor advised that MR. MAA tested negative for the flu.

115.   On April 1, 2020, with MR. MAA's symptoms now apparent, PLAINTIFFS reported to the medical center. Medical staff did not administer X-rays and advised there was no need to do so despite MRS. MAA's reminder that the doctor who had visited their room told MR. MAA to get a chest X-ray. Doctors present advised MR. MAA and six other passengers present of the tests that had been sent to Barbados and that each had tested positive for the Coronavirus.  MR. MAA tested positive for COVID-19.  MRS. MAA also began feeling ill, and had 100-101 degree fever, chills, coughing and headache.  All she could do was take Tamiflu and Tylenol, while she took care of MR. MAA.

116.   On April 2 and 3, 2020, despite having contracted COVID-19, MR. MAA was left in his room with MRS. MAA who was also sick.  PLAINTIFFS' daughter Nancy Chien reached out to the media and members of Congress to plead for help for MR. MAA.

117.   On April 4, 2020, after the denial of permission to land at Fort Lauderdale, the *Coral Princess* arrived in Miami. Five passengers were taken off the ship immediately. Two of the five were sent to a local hospital in Miami and the three others were airlifted to Tampa.  Despite also having COVID-19 for at least three days, MR. MAA was not taken to a hospital.

118.   On April 4, 2020, by 10:30 a.m. medical staff aboard the *Coral Princess* took MR. MAA to the medical department and put him on oxygen.  An hour later medical staff told MRS. MAA that he was doing well.

119.   MRS. MAA was also exhibiting symptoms of COVID-19 including fever, chills, and coughing, and the medical staff concluded she had been infected as well.  The doctor helped MRS. MAA move to a cabin in another section of the ship designated to isolate symptomatic passengers because they did not consider her ill enough to be moved to the medical department.

120.   As of 2:00 p.m. that same day, medical staff were hand pumping oxygen for MR. MAA because the mechanical ventilator on board the ship was not strong enough and advised MRS. MAA that he needed to be intubated.  By then, the doctors told MRS. MAA that they had been working on him for four hours.  Doctors told her that they called for an ambulance to take MR. MAA to an onshore hospital with a stronger ventilator and that his vitals were strong enough for transport. As for calling an ambulance for MR. MAA, nothing could be further from the truth.



The Coral Princess docks at the Port of Miami in Miami, Florida on Saturday, April 4, 2020.(Pedro Portal/Miami Herald)

121.   As of 5:30 p.m. an ambulance still had not arrived for MR. MAA. Doctors told MRS. MAA that Miami was in lockdown and no ambulances were allowed on the streets and MRS. MAA frantically called her daughters for help.  By 7:00 p.m. no ambulance had arrived, and PLAINTIFFS' daughter Julie Maa called a care line maintained by DEFENDANTS CARNIVAL and PRINCESS and/or their agents, representatives, and employees, and reached a PRINCESS representative in Chicago, who in turn connected the call to a local PRINCESS customer service representative in Florida named Suzanne. The Florida PRINCESS representative,

unaware that Ms. Maa was on the line, disclosed to the PRINCESS representative in Chicago that she knew of MR. MAA and understood his prognosis, stating "we're not sending an ambulance because he [MR. MAA] won't  make it," and confirmed that no ambulance had been called. Ms. Maa heard everything, and announced her presence on the line, whereupon, DEFENDANTS' Florida PRINCESS representative hung up, and DEFENDANTS' Chicago PRINCESS representative hung up shortly thereafter.   Shocked and upset, Ms. Maa told her sister and MRS. MAA that DEFENDANTS' representatives were refusing to help MR. MAA.

122.   After 8:00 p.m. Ms. Maa reached MRS. MAA aboard the ship and advised that no ambulance was coming and to call 911, but MRS. MAA could not do so because there was no cell phone service aboard the ship. Ms. Maa therefore called 911 from New York City in yet another attempt to secure an ambulance. She was transferred to a 911 operator in Miami-Dade County, Florida, and placed on hold for a long time, only to be told that they do not service the port.  Despite being told by the doctor on the *Coral Princess* that all public and private hospital beds were full, PLAINTIFFS' son-in-law Jason Chien meanwhile undertook efforts to contact hospitals in South Florida directly and found out that beds were available at the local hospitals. The family also turned to social media and members of Congress in an effort to draw attention to MR. MAA's predicament.

123.   Past 9:00 p.m., an onboard doctor finally informed MRS. MAA that an ambulance would arrive "within the hour" and that MR. MAA'S vital signs were stable and he was good for transport.  In the meantime, MRS. MAA did a group video call with their two daughters Nancy and Julie so they could see and talk to MR. MAA, and he could hear their voices.  The ambulance finally arrived at or around 10:00 p.m. and transported MR. MAA to Larkin Community Hospital Palm Springs Campus in Hialeah, Florida, about an hour away from the ship despite the fact there was a hospital only five minutes away from the ship.  MRS. MAA was not allowed to accompany MR. MAA.

124.   At 11:55 p.m., MR. MAA died at Larkin Community Hospital from COVID-19. Following cardiac arrest, the medical staff made 12 efforts to resuscitate him, and all were unsuccessful.  A doctor returned Ms. Maa's phone call to inform her that MR. MAA had died.  She called MRS. MAA and her sister to give them the sad news of MR. MAA'S passing.

125.   On April 5, 2020, the morning after MR. MAA died, the family resumed efforts to get MRS. MAA safely transferred off the *Coral Princess* and into a hospital on shore.  Ms. Maa reached out on social media for help. After hours of delay, and after several other passengers were taken off the ship and transported to hospitals, at shortly before 4:00 p.m., an ambulance arrived for MRS. MAA and transported her to Jackson Memorial Hospital on the campus of the University of Miami.   In the meantime, the MAAs' travel companions caught a charter flight home to California.

126.   On April 7, 2020, MRS. MAA received confirmation that she tested positive for COVID-19.  Daughter Julie flew to Miami from New York, and stayed in a hotel and AirBnb to lend support to MRS. MAA, but was not allowed to visit the hospital.   MRS. MAA spent more than two difficult weeks in the hospital and remained under hospital care until April 22, 2020.  Most days, she had to wash her own underwear and was not allowed to bathe.  On April 22, her transfer to a hotel was medically cleared. The taxi driver who arrived to pick her up misunderstood the plan and initially set out for the port, presumably intending to return her to the *Coral Princess*, where she and her deceased husband had been infected. Only by using her cell phone to call first her daughter and then a PRINCESS representative was MRS. MAA able to convince the driver to change course and deliver MRS. MAA to the hotel.

127.   MRS. MAA finally returned home to California on April 24, 2020, nearly two months after she and her husband had left for their dream vacation to Peru that ended as a nightmare of a lifetime.

128.   As of the date of this filing, MRS. MAA is still recovering from her COVID-19 symptoms and confined to her home in South San Francisco.

129.   As a direct and proximate result of DEFENDANTS' negligence and gross negligence, MR. MAA has died, and MRS. MAA was infected with SARS-CoV-2, requiring medical treatment.

130.   In addition to their debilitating physical injuries, PLAINTIFFS were traumatized by the fear of developing COVID-19. They were confined to the *Coral Princess* as the virus attacked and infected passengers on board the ship, and thereafter were confined on board at PortMiami and at other locations in Florida as they underwent treatment and isolation in quarantine.

## G.   CARNIVAL IS NOW UNDER CONGRESSIONAL INVESTIGATION FOR THEIR KNOWLEDGE OF INFECTIONS

131.   The history of CARNIVAL's disregard of the health and welfare of their passengers has not gone unnoticed as Congress looks into how so many people fell ill aboard cruise ships in the present crisis and the industry's failure to contain the spread in time. On May 1, 2020, the Chair of the U.S. House of Representatives' Committee on Transportation and Infrastructure Peter DeFazio and the Chair of the House Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney summarized this history in a records request letter to CARNIVAL formally opening an inquiry.[62] In the words of the DeFazio-Maloney letter:

> *Norovirus and other communicable diseases are not new public health threats to the cruise line industry. In 2010, the World Health Organization (WHO) identified norovirus and influenza outbreaks as "the major public health challenges for the cruise industry." This assessment was made an entire decade before COVID-19 emerged on the world's stage. . . .*

---

[62] Letter to Mr. Arnold W. Donald, President and CEO, Carnival Corporation & PLC, from the Committee on Transportation and Infrastructure, U.S. House of Representatives, Washington, D.C. (May 1, 2020). (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

*Cruise ships are a fertile breeding ground for infectious diseases due to their environmental conditions and physical structure. "Cruise ships passengers spend prolonged periods in close proximity to other passengers and crew, facilitating the rapid spread of highly infectious agents such as influenza," the Journal of Travel Medicine reported in 2018. Today, the CDC warns: "Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships."*

132.   Nevertheless, CARNIVAL, PRINCESS, and Dr. TARLING disregarded this crucial information and continued their operations as though nothing had changed, and despite their vaunted commitment to help aboard their ships, continued marketing their cruises largely as before. As the DeFazio-Maloney letter noted:

*As of April 23, 2020, none of the front facing web-pages from any of Carnival's nine affiliated cruise lines , – Carnival Cruise Line, Princess Cruises, Holland America Line, Seabourn, P&O Cruises (Australia), Costa Cruises, AIDA Cruises, P&O Cruises (UK), and Cunard – mentioned a single word about COVID-19, coronavirus, or the precautions these cruise lines intend to take once the CDC lifts its "No Sail Order" for cruise lines. Instead, these sites are advertising various images of couples dining and dancing, musicians entertaining, and lines of children holding hands and playing.*



63

---

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

**FIRST AMENDED COMPLAINT; 2:20-CV-06341-DSF-SK**                    46

## V.    <u>NOTICE</u>

133.    Section 15(A)(i) of the Passage Contract purports to require that claimants provide notice to PRINCESS and CARNIVAL of any potential claims within six months from the date of the underlying harm before commencing litigation. PLAINTIFF is resolute that this egregiously unfair provision is unenforceable. Nevertheless, PLAINTIFFS have complied with this requirement by providing written notice to DEFENDANTS' by overnight mail on June 5, 2020.

## VI.    <u>CLAIMS</u>

### <u>FIRST CLAIM</u>

### NEGLIGENCE – PERSONAL INJURIES

### (On Behalf of Mrs. Maa Against Each Defendant)

134.    PLAINTIFF incorporates herein by reference all of the allegations in this complaint.

135.    As owners and operations of the *Coral Princess*, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, owed PLAINTIFFS a duty to use reasonable care to prevent harm PLAINTIFFS and other invited passengers aboard the *Coral Princess*.

136.    As owners and operations of the *Coral Princess*, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, participated in the boarding process, the decision to set sail, the failure to provide personal protective equipment to PLAINTIFFS and others on board, the failure to impose distancing requirements, and the failure to sanitize the ship's surfaces.

137.    DEFENDANT PRINCESS in consultation with and with the full authorization of CARNIVAL, and/or each of them, and their agents, representatives, employees, officers, and others, failed to act as a reasonably careful reason would have acted in the same situation.

138.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, carelessly, recklessly, and/or unlawfully boarded the *Coral Princess* in San Antonio, Chile on March 5, 2020, which served as the legal cause of injuries and damages herein suffered by PLAINTIFF TOYLING MAA.

139.   As alleged in more detail above, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, failed to use reasonable care to prevent harm to others, including PLAINTIFF TOYLING MAA, when (among other things) they failed to warn MRS. MAA of the deadly virus aboard the ship and allowed MR. and MRS. MAA to board without implementing any sort of protective measures.

140.   MRS. MAA was harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when she contracted and suffered from COVID-19.  Further, MRS. NAHM  was harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when she suffered the distress of (i) contracting a deadly and highly contagious virus, (ii) being stuck in her room at sea with no explanation, (iii) being separated from her husband, (iv) being denied information about her husband's health, (v) observing her husband fall ill without explanation or medical care, (vi) fearing for her husband's life and her own, and (vii) was unable to be with her husband when he passed.  The conduct DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, toward PLAINTIFFS was so extreme as to go beyond all possible bounds of human decency.

141.   DEFENDANTS CARNIVAL and PRINCESS' failure to use reasonable care to prevent harm was a substantial factor in causing PLAINTIFFS' harm.

142.   DEFENDANT PRINCESS in consultation with and with the full authorization of CARNIVAL, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, wrongfully, unlawfully, and/or recklessly invited and boarded MRS. MAA onto the deadly cruise ship armed with COVID-19,

without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew. DEFENDANT PRINCESS in consultation with and with the full authorization of CARNIVAL, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, wrongfully, unlawfully, and/or recklessly boarded passengers, including MRS. MAA, without disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship and/or administering any COVID-19 tests or screening to any prior passengers and/or crew, leaving all new passengers, including MRS. NAHM, completely, unknowingly, and inescapably exposed to the deadly virus.

143.    DEFENDANTS, and/or each of them, ignored the "state of emergency" declarations related to COVID-19 made by the Governors of both states as of March 4, 2020, and instead made the negligent, wrongful, unlawful, and/or reckless decision to continue cruise ship operations without implementing any safety protocols and/or preventative measures, despite knowledge of the catastrophic risk to human life that COVID-19 posed and despite knowledge of the specific and acute threat the cruise ship industry presented related to COVID-19.   The officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, knew of the specific and acute threat the cruise ship industry presented related to COVID-19 as of March 4, 2020. The officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, also knew of the catastrophic risk COVID-19 posed to human life as of March 4, 2020.   Despite the aforementioned knowledge, the officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, made the negligent, wrongful, unlawful, and/or reckless decision to continue cruise ship operations without implementing any safety protocols and/or preventative measures to combat the foreseeable, specific, and/or acute and catastrophic threat posed to their passengers, including but not limited to, (a) screening and refusing to board passengers and crewmembers with recent contact with countries experiencing

outbreak of COVID-19; (b) providing precautionary medical apparatuses, such as masks, gloves and/or hand sanitizer; (c) imposing safety precautions on-board, such as social distancing; (d) disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship prior to boarding passengers; and/or (e) changing how they off-board and on-board passengers to the ship, instead of using practices where passengers off-boarding the ship come in close contact with passengers on-boarding the ship.

144.   As a direct and legal result of the aforementioned wrongful conduct of DEFENDANTS, and/or each of them, PLAINTIFFS both got COVID-19 on the *Coral Princess* and MR. MAA eventually died from the virus.

145.   PRINCESS, as authorized by CARNIVAL, also sold PLAINTIFFS the air travel that conveyed them to the cruise departure point from San Francisco.

146.   CARNIVAL and PRINCESS, and/or each of them, participate in the marketplace as common carriers. Tickets for its cruises are marketed to the general public. In addition to a vacation, as part of the contractual relationship reached between DEFENDANTS and their customers, passengers aboard DEFENDANTS' cruise ships may reasonably expect and do expect safe passage on ocean-worthy vessels free from any known or knowable dangers or perils.

147.   Common carriers must carry passengers safely. Common carriers must use the highest care and the vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business. DEFENDANTS, and/or each of them, failed to do so here.

148.   As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, PLAINTIFF MRS. MAA was injured in her health, strength, and activity, sustained injuries to her body and

mind, all of which have caused PLAINTIFF great physical, mental, emotional, and nervous pain and suffering. PLAINTIFF is informed and believes, and upon such information and belief alleges, that such injuries have resulted in debilitating injuries, all to her general damage in a sum according to proof.

149. As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, PLAINTIFF MRS. MAA was required to, and continues to, employ physicians and other health care providers to examine, treat and care for her injuries, and have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment rehabilitation and care in an amount according to proof.

150. As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, PLAINTIFF MRS. MAA was gainfully employed, and/or capable of gainful employment through her education, training, and/or experience. By further reason of DEFENDANTS' wrongful conduct hereinabove alleged, PLAINTIFF MRS. MAA suffered a loss of income and/or a loss of earning capacity in an amount according to proof.

151. As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, PLAINTIFF MRS. MAA contemporaneously perceived her husband, PLAINTIFF MR. MAA dying from COVID-19, and thereby suffered extreme emotional distress, including nervousness, grief, anxiety, worry, mortification, shock, indignity, apprehension, terror or ordeal, all in an amount according to proof.

152. As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, PLAINTIFF MRS. MAA suffered and continues to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, society, and moral support, all in an amount to be determined.

153.   As a further direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, hereinabove alleged, PLAINTIFF MRS. MAA incurred funeral and burial expenses, all in an amount to be determined.

154.   In doing the wrongful acts as hereinabove alleged, DEFENDANTS, and/or each of them, acted with oppression, fraud, and malice and/or with conscious and/or willful disregard for the health, safety and general welfare and rights of PLAINTIFFS. Such actions were done with malice, oppression, fraud, and/or conscious disregard for human life and were and are despicable, shocking and offensive and entitle PLAINTIFFS to an award of punitive damages against DEFENDANTS in an amount to be determined at trial. DEFENDANTS' failure to heed the warnings of the California and Florida Governors and the CDC and to apply the knowledge gained from the outbreaks aboard the *Diamond Princess* and *Grand Princess,* decision to proceed with cruise ship operations, including the *Coral Princess* cruise, without changing any operations to better safeguard passengers' health and/or safety, including but not limited to,  pre-screening passengers, disinfecting or decontaminating the ship, providing masks and/or gloves, was an extreme departure from what a reasonable cruise ship owner and operator would do and reflects callousness and an extreme, willful, and outrageous disregard for the health and safety of its passengers. Especially considering the DEFENDANTS knowledge of the specific, acute, and/or foreseeable threat that cruise ships, and their ships in particular, posed related to COVID-19 and catastrophic risk to human life that COVID-19 posed. In all of these decisions, DEFENDANTS were driven by profit, and chose not to expend resources for the safety and health of passengers, but rather keep them ignorant and in the dark so they would proceed to enjoy their vacation as planned and spend money on onboard purchases, where DEFEDANTS, and/or each of them, make their largest profits.

### SECOND CLAIM

### NEGLIGENCE – WRONGFUL DEATH

### UNDER THE DEATH ON THE HIGH SEAS ACT

### (On Behalf of the Estate of Wilson Maa Against Each Defendant)

155.   PLAINTIFF hereby re-alleges and incorporates herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

156.   This action arises under 46 U.S.C. 30301 et seq., otherwise known as the Death on the High Seas Act.

157.   MRS. MAA is the surviving spouse of MR. MAA, and is the court-appointed personal representative of the Estate of Wilson Maa.[64]

158.   MRS. MAA, as the personal representative of MR. MAA'S Estate, seeks damages related to the costs associated with her husband's death (including but not limited to funeral and burial expenses, counseling expenses, loss of financial support, and the value of household services), and for all damages recoverable under the law.

159.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, negligently, carelessly, recklessly, and/or unlawfully acted and/or failed to act as hereinabove set forth, so as to cause the death of MR. MAA.

160.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, owned, operated, managed, maintained, manned, provisioned, equipped, controlled, supervised, operated and navigated the *Coral Princess* with reckless and callous disregard for MR. MAA'S safety.

---

[64] Issuance of the court order appointing Mrs. MAA the personal representative is pending. *See* 46 U.S.C. § 30302; *Helman v. Alcoa Global Fasterners, Inc.*, 843 F.Supp.2d 1038 (C.D. Cal. 2011).  MRS. MAA is the sole beneficiary of MR. MAA'S trust and successor-in-interest pursuant to Cal. Civ. Proc. Code § 377, et seq.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

161.   As a direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, MR. MAA contracted and died from COVID-19 alone, without his wife and family.

162.   As a direct and legal result of the wrongful conduct of DEFENDANTS, and/or each of them, MRS. MAA as the personal representative of the Estate of MR. MAA incurred expenses and pecuniary damages continue to accrue.

## VII.   **PRAYER FOR RELIEF AND DEMAND FOR JURY**

WHEREFORE, PLAINTIFFS, on behalf of themselves and all persons similarly situated, respectfully prays that this Court grant the following relief:

1.   For compensatory and general damages in an amount according to proof;

2.   For past and future medical, incidental, and service expenses according to proof;

3.   For pre- and post-judgment interest on all damages as allowed by the law;

4.   For costs of suit incurred herein;

5.   For attorney fees under existing law;

6.   For an award of punitive damages; and

7.   For such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

PLAINTIFF further demands trial by jury on all issues.

Dated: October 20, 2020       **COTCHETT, PITRE & McCARTHY, LLP**

By: */s/ Nanci E. Nishimura*
     NANCI E. NISHIMURA
     KELLY W. WEIL
     JAMES G. DALLAL
     *Attorneys for Plaintiffs*

Dated: October 20, 2020       **ANDERLINI & McSWEENEY LLP**

By: */s/ P. Terry Anderlini*
     P. TERRY ANDERLINI
     *Attorneys for Plaintiffs*